**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SUFFOLK COUNTY WATER AUTHORITY,<br><br>               Plaintiff,<br><br>  -against-<br><br>EAST HAMPTON ENERGY STORAGE CENTER, LLC; LG CHEM, LTD.; and LG ENERGY SOLUTION, LTD.,<br><br>               Defendants. | **Complaint for a Civil Case**<br><br>Case No.<br><br><br>Jury Trial Demanded |

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................ 1

II.     PARTIES ............................................................................................................ 3

III.    JURISDICTION AND VENUE ......................................................................... 4

IV.     FACTUAL ALLEGATIONS ............................................................................. 5

        A.  The Authority's Bridgehampton Wells............................................................ 5

        B.  The EHESC Facility ......................................................................................... 6

        C.  BESS Fires ........................................................................................................ 8

        D.  The EHESC Fire ............................................................................................. 12

        E.  EHESC Contaminants: Characteristics and Risks ........................................ 13

        F.  The Authority Is Injured Because of the EHESC Fire................................... 15

        G.  The EHESC Fire Caused Contamination in the Bridgehampton Wells. ................... 16

V.      CAUSES OF ACTION ..................................................................................... 16

        FIRST CAUSE OF ACTION
            Negligence ..................................................................................................... 16

        SECOND CAUSE OF ACTION
            Public Nuisance .............................................................................................. 19

        THIRD CAUSE OF ACTION
            Trespass........................................................................................................... 21

        FOURTH CAUSE OF ACTION
            Strict Product Liability for Defective Design ............................................... 23

        FIFTH CAUSE OF ACTION
            Strict Product Liability for Manufacturing Defect......................................... 25

VI.     PRAYER FOR RELIEF ................................................................................... 26

VII.    DEMAND FOR JURY TRIAL ........................................................................ 27

i

## I.      INTRODUCTION

1.      Plaintiff Suffolk County Water Authority ("the Authority," or "Plaintiff") is a public drinking water provider serving approximately 1.2 million residents and businesses in Suffolk County, New York. The Authority brings this action to recover the substantial costs necessary to protect the public and restore its damaged drinking water supply wells, which are contaminated with the chemical perfluoropropionic acid ("PFPrA"), among potentially other chemicals, which were released during a fire at the East Hampton Energy Storage Center ("EHESC").

2.      EHESC is a lithium-ion battery energy storage system ("BESS") that provides energy supply to the Long Island Power Authority ("LIPA"). On May 31, 2023, a thermal runaway event in battery cells at EHESC caused a fire (the "EHESC Fire"). During the EHESC Fire, battery casings opened and released their contents. Large amounts of water applied to fight the EHESC Fire ran off of the facility and onto the dirt road and undeveloped area south of EHESC, conveying chemicals from the batteries ("EHESC Contaminants") along with it. The contaminated fire suppression water percolated into the ground and transported EHESC Contaminants to the groundwater, through which EHESC Contaminants migrated to wells in the Authority's Bridgehampton Road wellfield ("Bridgehampton").

3.      The Authority has detected EHESC Contaminants in its Bridgehampton wells, including PFPrA, an ultrashort-chain per- and polyfluorinated alkyl substance ("PFAS"),  at levels that exceed the 50 parts per billion ("ppb") New York State maximum contaminant level ("MCL") for unspecified organic contaminants ("UOC MCL").[1] An MCL is the maximum level of a

---

[1] The UOC MCL is denominated in micrograms per liter ($\mu$g/L); this unit is equivalent to parts per billion. *See, e.g.*, Washington Dept. of Ecology, EIM Help Center: Valid Value - Unit

contaminant allowed in public drinking water which, once established, creates a standard that requires water systems to monitor contaminant levels, keep contaminant levels below the MCL, and report exceedances to customers.

4.      The EHESC Contaminants include ultrashort-chain PFAS, which are known components of lithium-ion battery cells and/or environmental breakdown products of such components. "Ultrashort-chain PFAS" refers to PFAS molecules with two or three carbon atoms. There is a growing body of evidence of the toxicity of ultrashort-chain PFAS, including those detected in the Bridgehampton wells.

5.      Additional EHESC Contaminants may have already or will soon arrive at the Bridgehampton wells. The Authority's sampling, monitoring, and testing for EHESC Fire impacts is ongoing.

6.      To prevent exposing its customers to elevated levels of EHESC Contaminants, and in response to the exceedances of the UOC MCL, the Authority has removed two Bridgehampton wells from service and restricted its use of the two other Bridgehampton wells. Additionally, the Authority has expended staff and financial resources developing sampling methods, sampling for EHESC Contaminants, and investigating options to recover water supply impacted by those contaminants.

7.      The Defendants in this action are (1) East Hampton Energy Storage Center, LLC, the developer, owner, and operator of EHESC, which negligently and/or recklessly designed or built the EHESC in a manner that resulted in the EHESC Fire, operated EHESC in a manner that caused the EHESC Fire, and/or failed to prevent runoff and recharge from EHESC such that

---

Conversions, https://apps.ecology.wa.gov/eim/help/ValidValues/UOMConversions (accessed May 20, 2026).

EHESC Fire contaminants were released to the environment; and (2) LG Chem, Ltd., the manufacturer and seller of the batteries that started the EHESC Fire (and its successor-in-interest, LG Energy Solution, Ltd.), which sold, marketed, and promoted its batteries despite manufacturing and/or design defects in those products.

8.     The Authority brings this action to recover compensatory damages and all other remedies, including but not limited to all necessary funds to compensate the Authority for the costs of treating contaminated water to remove EHESC Contaminants from its drinking water wells that have been, and continued to be, contaminated by EHESC Contaminants, and all associated costs, and to ensure that the parties responsible for the drinking water contamination bear this expense, rather than the Authority and its ratepayers.

## II.     PARTIES

9.     **Plaintiff Suffolk County Water Authority** is a public drinking water provider under the New York Public Authorities Law, Article 5, Title 4 (Sections 1074–1092). Operating as a public benefit corporation since 1951, the Authority has grown to become one of the largest groundwater suppliers in the nation, serving approximately 1.2 million customers. The Public Authorities Law provides that the Authority, in carrying out its powers, purposes, and duties, acts in all respects for the benefit of the people of the County of Suffolk and State of New York, for the improvement of their health, welfare, and prosperity.

10.     **Defendant East Hampton Energy Storage Center, LLC**, is a limited liability company incorporated in Delaware and with its principal place of business in Juno Beach, Florida. Defendant East Hampton Energy Storage Center, LLC is the developer, owner, operator, manager, and maintainer of EHESC. Defendant East Hampton Energy Storage Center, LLC leases the real property on which EHESC is located. Defendant East Hampton Energy Storage Center, LLC is a

3

joint venture between subsidiaries of the energy companies NextEra Energy, Inc. and National Grid plc.

11.      **Defendant LG Chem, Ltd.** is incorporated in Korea and maintains its headquarters and principal offices in Seoul, South Korea. Defendant LG Chem, Ltd. has designed and manufactured lithium-ion battery cells sold, supplied, and/or used in New York, including those that were used at EHESC.

12.      **Defendant LG Energy Solution, Ltd.** is incorporated in Korea and maintains its headquarters and principal offices in Seoul, South Korea. Defendant LG Energy Solution, Ltd. is the successor-in-interest to LG Chem, Ltd.'s lithium-ion battery liabilities. Defendant LG Energy Solution, Ltd. was formed on December 1, 2020, in a spin-off of LG Chem, Ltd.'s battery division.

13.      The Authority is informed and believes, and thereon alleges, that Defendant LG Chem, Ltd. transferred its liabilities associated with its design, manufacture, and sale of lithium-ion battery cells, including those that were used at EHESC, to Defendant LG Energy Solution, Ltd., in the December 1, 2020 spin-off of Defendant LG Chem, Ltd.'s battery division.

14.      Defendants LG Chem, Ltd. and LG Energy Solution, Ltd. are referred to herein as the "Manufacturer Defendants."

## III.    JURISDICTION AND VENUE

15.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are diverse and the amount in controversy exceeds $75,000.

16.      This Court has jurisdiction over Defendants because each is, or is the successor-in-interest to, a corporation or other business that has sufficient minimum contacts in New York or otherwise intentionally avails itself of the New York market, so as to render the exercise of jurisdiction over it by this Court consistent with traditional notions of fair play and substantial justice.

17.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events, omissions, and harms that are the basis of Plaintiff's claims occurred in substantial part in this judicial district.

## IV.    FACTUAL ALLEGATIONS

### A.    The Authority's Bridgehampton Wells

18.    The Authority's Bridgehampton Road wellfield ("Bridgehampton") is a 13.9-acre site located in the Town of East Hampton, New York, approximately 2,500 feet south of EHESC.

19.    The Authority is authorized to pump up to 3,220 gallons per minute ("gpm") from four wells at Bridgehampton. The Authority refers to these wells as Bridgehampton Road Wells 2B, 3A, 4, and 5A.

20.    All four Bridgehampton wells extract water from the Upper Glacial aquifer, from depths between 125 and 150 feet.

21.    Groundwater in the vicinity of Bridgehampton and EHESC flows approximately from north to south.

22.    Wells 3A and 5 are each equipped with granulated activated carbon ("GAC") treatment to remove volatile organic compounds and long-chain PFAS. Water from all four wells is treated in an iron removal treatment plant before entering the Authority's distribution system.

23.    The existing treatment on the Bridgehampton wells is not capable of effectively removing EHESC Contaminants, including ultrashort-chain PFAS.

24.    Bridgehampton contributes more than seven percent of the water to the Authority's Zone 23 pressure zone.

5

25.    Any loss of production from the Bridgehampton wells seriously impedes the Authority's ability to satisfy peak day demand in that pressure zone and could prevent the Authority from meeting the state-mandated minimum water pressure in its distribution system.

26.    The Authority owns the drinking water production wells at Bridgehampton, as well as the associated treatment facilities and distribution system.

27.    The Authority has never consented to the introduction of any EHESC Contaminants or any PFAS into its wells, treatment plants, or distribution system.

**B.    The EHESC Facility**

28.    EHESC is a 4,100 square-foot battery energy storage facility located at 3 Cove Hollow Road in East Hampton, New York. EHESC has storage capacity of 40,000 kilowatt hours ("kWh") of electricity in its lithium-ion battery array.

29.    The facility was constructed in 2017 and/or 2018. EHESC began commercial operations in or around August 2018.

30.    Defendant East Hampton Energy Storage Center, LLC sells energy storage and generation capacity at EHESC and related services to the Long Island Power Authority ("LIPA") pursuant to a power purchase agreement executed in or about May 2017. LIPA does not own or operate EHESC.

31.    EHESC provides "peak-smoothing" services to LIPA. That is, the facility draws power from the electrical grid during periods of low demand; stores that power in its lithium-ion battery array; and releases the power back into the grid during high demand, to "smooth" the demand on energy generation facilities.

32.    At the time of the EHESC Fire, EHESC was equipped with a water-based heat and fire suppression system. Spraying water directly on burning lithium-ion batteries was known at that time to pose an environmental risk by causing unwanted air and water emissions.

33.    EHESC consisted of an array of LGCHEM JH3 lithium-ion battery cells manufactured and supplied by the Manufacturer Defendants.

34.    LGCHEM JH3 batteries use a nickel-manganese-cobalt ("NMC") mixture as the primary cathode material.

35.    According to a Safety Data Sheet for the LGCHEM JH3 prepared by LG Chem Ltd. ("JH3 SDS"), LGCHEM JH3 battery cells contain polyvinylidene fluoride, a PFAS-based fluoropolymer that is manufactured with and contains carboxylic acid PFAS compounds.[2]

36.    PFPrA is a carboxylic acid.

37.    According to the JH3 SDS, LGCHEM JH3 battery cells contain a proprietary electrolyte mixture of undisclosed ingredients.[3]

38.    PFAS are commonly used as electrolyte fluids in rechargeable lithium-ion batteries due to their conductivity, electrochemical stability, low volatility, and low flammability.

39.    The Authority is informed and believes, and thereon alleges, that the electrolyte mixture in the EHESC battery cells contained PFAS compounds, including, but not limited to, PFPrA and/or other PFAS that can transform or degrade into PFPrA.

40.    The JH3 SDS warns that, in the event of an accidental release of a JH3 battery and/or its contents, environmental precautions should include prevention of "runoff and contact

---

[2] LG Chem., Ltd., Safety Data Sheet: LGCHEM JH3 Lithium-Ion Battery Cell (2015) at 2, https://evwest.com/support/JH3-Cell_SDS_LGChem_for_RESU-Gen2-Products_R1.5-1.pdf?srsltid=AfmBOoprgFZWyNp_KoV8VezhSh7Muy0M51ZBUOrfn-Eq1b4n1B5oC5ZY (accessed May 20, 2026).

[3] Id.

7

with waterways, drains or sewers;" and that any "containment" should be "prevent[ed], by any means available . . . from entering drains or water course."[4]

### C.    BESS Fires

41.    There have been over 30 BESS fires in the United States since 2012 and over 100 such events globally since 2011.

42.    BESS fires, their causes, and their impacts, are well studied. Defendants were or should have been aware of the extensive body of knowledge on those subjects, and taken precautionary steps in response thereto, at the time the batteries used in EHESC were designed, manufactured, and sold; and at the time EHESC was designed, installed, integrated, operated, and when the EHESC Fire occurred.

43.    BESS fires can cause extensive physical, environmental, and public health injuries. Impacts of BESS fires have included explosions that injured fire fighters responding to a fire; releases of toxic gases generated within lithium-ion battery cells; releases of large amounts of battery cell contents, including PFAS and metals, to the environment; and generation of smoke plumes containing levels of particulate matter that may impact public health; among others.

44.    Lithium-ion batteries are "inherently fragile, and any electrical, thermal, or mechanical abuse, along with internal defects, can potentially initiate cell failure and thermal runaway."[5]

---

[4] Id. at 4.

[5] DNV-GL, McMicken Battery Energy Storage System Event Technical Analysis and Recommendations (July 18, 2020) at 20, https://www.aps.com/-/media/APS/APSCOM-PDFs/About/Our-Company/Newsroom/McMickenFinalTechnicalReport.pdf?la=en&sc_lang=en&hash=5447FA39 1CD988DD24226FA485F81F23 (accessed May 20, 2026).

45. "Thermal runaway" refers to a phenomenon in which lithium-ion batteries enter an uncontrollable, self-heating state. Once a battery enters thermal runaway, the heat and pressure build-up within the cell may lead to the catastrophic structural failure of the battery casing, and the risk of additional combustion as a result of exposure to outside air.

46. Thermal runaway in lithium-ion batteries commonly leads to explosion and/or fire.

47. Thermal runaway and fire in one battery cell can propagate to adjacent cells.

48. "Tightly packed batteries [as in a BESS array] trap and hold heat between them. If a thermal barrier is absent or ineffective, or if there is no physical separation of the cells to prevent the trapping of heat, or if there is no mechanism to dissipate this heat, it will remain there as a thermal hazard that can reintroduce thermal runaway to any unburned cells and/or potentially ignite any flammable gases that continue to smolder."[6]

49. Root cause analyses are often performed on BESS fires. EPRI, a renewable energy industry group, categorizes the most common root causes of BESS fires as follows:

  a. **Design**: "A failure due to planned architecture, layout, or functioning of the individual components or the energy storage system as a whole. Design failures include those due to a fundamental product flaw or lack of safeguards against reasonably foreseen misuse."[7]

  b. **Manufacturing**: "A failure due to a defect in an element of an energy storage system introduced in the manufacturing process, including but not limited to,

---

[6] Id. at 55.

[7] EPRI, Insights from EPRI's Battery Energy Storage Systems (BESS) Failure Incident Database (Analysis of Failure Root Cause) (May 2024) at 4, https://www.epri.com/research/products/000000003002030360 (accessed May 14, 2026).

the introduction of foreign material into cells, forming to incorrect physical tolerances, or missing or misassembled parts."[8]

c. **Integration, Assembly & Construction**: "A failure due to poor integration, component incompatibility, incorrect installation of elements of an energy storage system or due to inadequate commissioning procedures."[9]

d. **Operation**: "A failure due to the charge, discharge, and rest behavior of the energy storage system exceeding the design tolerances of an element of an energy storage system or the system as a whole. Operational failures include, but are not limited to, incorrect sensing of voltage, current, temperature, and other set point values, or operation above designed temperature, C-rate, state of charge, or voltage limits of the energy storage system."[10]

50.    Approximately 35% of identified BESS failure root causes are Design and/or Manufacturing flaws in the battery cells used in the BESS.[11]

51.    Approximately 65% of identified BESS failure root causes are Integration, Assembly & Construction; and/or Operational failures at the BESS.[12]

52.    Alternative lithium-ion battery designs were available to the Manufacturer Defendants, adoption of which could have prevented or mitigated the Authority's injuries. Such alternative designs include, but are not limited to, use of cathode materials, such as lithium-iron-

---

[8] Id.

[9] Id.

[10] Id.

[11] *See* id. at 7.

[12] *See* id.

10

phosphate, that have much greater temperature tolerance than NMC-based batteries; and PFAS-free battery designs.

53.     Internal battery cell defects that can cause an internal short circuit, leading to thermal runaway, include abnormal lithium metal deposition and dendritic growth within the cell.[13]

54.     Manufacturing Defendants provided lithium-ion battery cells to a BESS in Surprise, Arizona that caught fire in April 2019. A root cause analysis of that fire evaluated several randomly selected battery cells supplied by the Manufacturer Defendants to that facility and a separate BESS, all of which exhibited abnormal lithium metal deposition and abnormal dendritic growth. The investigators concluded that these internal cell defects caused the cell failure that initiated that fire.[14]

55.     Manufacturer Defendants have supplied batteries to at least 21 BESS facilities that have experienced a failure event, which in the case of lithium-ion BESS, generally means a fire or explosion.[15]

56.     Underwriters' Laboratory, a global authority on industrial safety, has observed that "most lithium-ion battery safety standards and testing protocols do not specifically include testing for internal short circuits."[16]

---

[13] DNV-GL, McMicken Battery Energy Storage System Event Technical Analysis and Recommendations (July 18, 2020) at 24, https://www.aps.com/-/media/APS/APSCOM-PDFs/About/Our-Company/Newsroom/McMickenFinalTechnicalReport.pdf?la=en&sc_lang=en&hash=5447FA39 1CD988DD24226FA485F81F23 (accessed May 20, 2026).

[14] Id.

[15] EPRI, BESS Failure Incident Database, https://storagewiki.epri.com/resources/assets/BESS_Failure_Database/Failure_DB_List.csv (accessed May 14, 2026).

[16] Underwriters Laboratory, Safety Issues for Lithium-Ion Batteries (2013) at 9, https://code-authorities.ul.com/wp-content/uploads/2016/02/Safety_Issues_for_Lithium_Ion_Batteries1.pdf (accessed May 20, 2026).

**D.    The EHESC Fire**

57.    On May 31, 2023, a fire occurred at EHESC, impacting the lithium-ion battery system in the building.

58.    The Authority is not aware that Defendants or any governmental entity or investigator has identified or disclosed an initiating event or root cause of the EHESC Fire.

59.    The Manufacturer Defendants, as designers, manufacturers, sellers, and suppliers of the battery cells used at EHESC, supplied EHESC with battery cells containing design and/or manufacturing flaws, such as abnormal deposition of lithium and/or conditions facilitating dendritic growth, which resulted in a thermal runaway event at EHESC, and which in turn ignited the EHESC Fire.

60.    Defendant East Hampton Energy Storage Center, LLC, as developer, operator, manager, and maintainer of EHESC, caused, allowed to be caused, or failed to prevent Integration, Assembly, and Construction failure, such as failure to properly design and space battery cell arrays; and/or Operational failure in its BESS system, such as failure to control charging protocols and failure to provide adequate downtime for battery cells, which resulted in a thermal runaway event at EHESC, and which in turn ignited the EHESC Fire.

61.    Once the EHESC Fire ignited, EHESC's automatic fire suppression system started operating. That system ran for approximately 30 hours to make sure the battery fire had been fully extinguished.

62.    Assuming EHESC complied with New York State regulations requiring the fire suppression system to deliver water at a rate of 0.3 gpm per square foot, and assuming the sprinkler system was deployed over the entire 4,100-square foot facility, the sprinkler system would have discharged over 2.2 million gallons of water over 30 hours.

12

63.    EHESC was not equipped with facilities capable of containing the fire suppression water and preventing it from running off onto the permeable surfaces adjacent to EHESC. EHESC had no facilities capable of preventing the release of EHESC Contaminants in fire suppression water to the environment.

64.    A large quantity of fire suppression water from the EHESC Fire did, in fact, run off to permeable surfaces adjacent to EHESC, where it percolated into the ground and eventually migrated to groundwater.

65.    EHESC Contaminants, including PFAS, are known constituents of lithium-ion batteries and are known to dissolve in and migrate with fire extinguishing water deployed at battery fires.

66.    Fire suppression water from the EHESC Fire transported EHESC Contaminants from batteries at EHESC to the groundwater aquifer, whereby those EHESC Contaminants, including, but not limited to, PFPrA and/or PFAS that ultimately transformed or degraded into PFPrA, were transported to and contaminated the Bridgehampton wells.

E.    **EHESC Contaminants: Characteristics and Risks**

67.    PFPrA is a species of ultrashort-chained PFAS.

68.    PFAS are organic chemicals characterized by a carbon-fluorine bond that is one of the strongest chemical bonds that occurs. PFAS are extremely persistent in the environment and have the potential to bioaccumulate and biomagnify.

69.    PFAS have unique characteristics that cause extensive and persistent environmental contamination. Specifically, they are (1) mobile—that is, because they do not adsorb (stick) to soil particles, they are readily transported through the soil and into groundwater where they can migrate long distances; and (2) persistent—that is, they do not readily biodegrade or chemically degrade

13

in the environment or in  conventional treatment systems for drinking water. In short, once PFAS are applied, discharged, disposed of, or otherwise released onto land, those compounds migrate through the subsurface and into groundwater, resist natural degradation, and are difficult and costly to remove from water.

70.    Ultrashort-chain PFAS, such as PFPrA, tend to be even less likely to adsorb to organic carbon in the environment. While they are relatively less bio-accumulative than longer-chain PFAS, they are relatively more susceptible to dissolving in water and more mobile in the environment.

71.    PFPrA can appear in the environment as an environmental breakdown product of other PFAS compounds. That is, other PFAS compounds that are released to the environment can degrade and/or transform, through chemical and physical processes, into PFPrA.

72.    The EPA Office of Research and Development has published a human health toxicity value for PFPrA with a calculated non-cancer chronic reference dose of 0.0005 mg/kg per day.

73.    The PFPrA chronic reference dose is 100 times lower than the 50-ppb UOC MCL.

74.     In animal studies, PFPrA has been associated with altered liver function. PFPrA has not been tested for carcinogenicity.

75.    There is growing evidence of the toxicity of ultrashort-chain PFAS. The acute toxicity of PFPrA on freshwater invertebrates has been found to be higher than that of the longer-chain PFAS.

76.    PFPrA is regulated in drinking water pursuant to the New York State UOC MCL.

14

77. There may be additional EHESC Contaminants that have reached the Bridgehampton wells. The Authority's investigation into the impacts of the EHESC Fire remains ongoing.

**F.      The Authority Is Injured Because of the EHESC Fire.**

78. Since it began sampling for ultrashort-chain PFAS in January 2026, the Authority has detected PFPrA in all four Bridgehampton wells. Detections in two Bridgehampton wells have exceeded New York State's 50-ppb UOC MCL, NYCRR Title 10 Part 5, subpart 5-1 Table 3.

79. The Authority has removed from service both Bridgehampton wells in which PFPrA levels have exceeded the UOC MCL, in response to those exceedances.

80. The Authority has reduced its use of and reliance on the other two Bridgehampton wells in response to the presence of EHESC Contaminants.

81. The Authority must replace or recover the water supply impacted by the EHESC Fire to ensure it has sufficient supply to meet demand. It is investigating two options for doing so, both of which come at considerable expense: (1) installing and operating treatment to remove EHESC Contaminants from water pumped from the Bridgehampton wells; and (2) installing replacement wells of comparable capacity in an area close enough to Bridgehampton to maintain pressure and supply in the distribution system and far enough away to avoid contamination from the EHESC Fire.

82. Either option for replacing the lost supply (treatment or replacement wells) will cost millions of dollars.

83. The Authority has incurred other expenses responding to contamination from the EHESC Fire, including, but not limited to, in sampling and monitoring of the Bridgehampton and other nearby wells; in developing and conducting laboratory analytical methods to measure the

15

levels of EHESC Contaminants in its wells; and in the staff costs associated with investigating options for a permanent response to EHESC Fire contamination.

### G.    The EHESC Fire Caused Contamination in the Bridgehampton Wells.

84.    Contaminants originating at the EHESC Fire have migrated to the Bridgehampton wellfield and entered the Authority's wells and distribution system.

85.    PFAS sampling at monitoring wells between EHESC and Bridgehampton has produced even higher detections of PFPrA upgradient of the Bridgehampton wells. Because contaminant concentrations in groundwater tend to be higher nearer to where the contaminant was released, this is evidence that EHESC is a source of PFPrA in the Bridgehampton wells.

86.    Modeling performed for the Authority's Source Water Assessment Program ("SWAP") indicates that EHESC is located in or adjacent to the Bridgehampton wells' estimated zones of contribution (i.e., the land surface and subsurface area that contributes groundwater to a pumping well). This means that water, and contaminants therein, that enter the ground at or near EHESC will eventually be captured by the Bridgehampton wells under the modeled pumping conditions.

87.    Outside of Bridgehampton, the Authority has detected PFPrA in only five of its approximately 600 active supply wells. The levels of PFPrA in the Bridgehampton wells are several orders of magnitude higher than any other PFPrA detection in SCWA's system.

## V.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Negligence
### (Against Defendant East Hampton Energy Storage Center, LLC)

88.    The Authority realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

16

89.    Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest, as the owners and operators of EHESC, managed, stored, used, transported, disposed of, and/or released EHESC Contaminants, and owed a non-delegable duty of care to the Authority to conduct their operations in a safe manner, including a duty to design, integrate, assemble, construct, maintain, and operate EHESC safely, in a manner that protected the public, including Plaintiff, from chemical exposure and environmental hazards.

90.    Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest's duties included but were not limited to a duty to ensure proper safety protocols, fire prevention measures, and storage and handling procedures; and to mitigate the risk of thermal runaway, chemical reactions, explosions, fires, and harmful releases of chemicals associated with their BESS operations.

91.    Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest knew or reasonably should have known that lithium-ion batteries can overheat, creating thermal runaway, can cause fire and explosions, and can cause releases of hazardous materials.

92.    Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest knew or reasonably should have known that lithium-ion batteries are prone to fires, and that storing lithium-ion batteries in enclosed spaces is dangerous.

93.    Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest knew or reasonably should have known that water used to suppress battery fires may contain harmful contaminants released from the batteries, including PFAS, that readily migrate through groundwater when introduced to the environment.

94.    Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest breached its duties owed to Plaintiff by, among other things:

17

a.  Failing to design, integrate, assemble, construct, maintain, and operate EHESC in such a way as to ensure its safe and proper operation;

b.  Failing to monitor and mitigate risks associated with the storage and use of lithium-ion batteries;

c.  Failing to maintain adequate safety protocols and fire suppression systems to prevent and/or control fires and thermal runaway;

d.  Failing to act reasonably to protect against, remediate, contain, and eliminate spills and/or discharges of EHESC Contaminants before they injured the Authority;

e.  Failing to act reasonably to minimize the damage to the Authority's property; and

f.  Any other negligent acts and/or omissions which may be discovered and proven at trial in this matter.

95.  Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest's conduct is a substantial factor in bringing about the contamination of the Authority's wells.

96.  As a direct and proximate result of Defendant East Hampton Energy Storage Center, LLC and/or its predecessors-in-interest's acts and omissions as alleged herein, the Authority has incurred, is incurring, and will continue to incur injuries and damages related to the contamination of its wells with EHESC Contaminants in an amount to be proved at trial.

97.  Defendant East Hampton Energy Storage Center, LLC and/or its predecessor-in-interest, acting through its directors, managers, and/or officers, knew it was substantially certain that its acts and omissions described above would cause injury and damage, including contamination of the Authority's wells with EHESC Contaminants. Defendant East Hampton Energy Storage Center, LLC and or its predecessor-in-interest, acting through its directors,

18

managers, and/or officers, committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, the Authority requests an award of punitive damages in an amount sufficient to punish Defendant East Hampton Energy Storage Center, LLC and that fairly reflects the aggravating circumstances alleged herein.

98.    Defendants are jointly and severally liable for all such damages, and the Authority is entitled to recover all such damages and other relief as set forth below.

**SECOND CAUSE OF ACTION**
**Public Nuisance**
**(Against All Defendants)**

99.    The Authority realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

100.    The Authority provides drinking water from its wells to residents and businesses for drinking, bathing, cleaning, washing, fire protection, and other uses.

101.    Because the Authority is a public entity, the water it provides to those residents and businesses is a public or commonly held resource. Members of the public have a right to have their water remain clean, potable, and free of contamination by toxic, manmade compounds.

102.    The intentional, negligent, and/or reckless activities of Defendants and/or their predecessors-in-interest which resulted in the releases of EHESC Contaminants from EHESC, as alleged herein, have contaminated Plaintiff's wells with hazardous chemicals, necessitating the Authority's closure of and/or reduced reliance on those wells, thereby interfering with the public's right to access and use that water.

19

103.    Consequently, Defendants and/or their predecessors-in-interest substantially and unreasonably interfered with and caused damage to a public or common resource that endangered public property, as well as the health, safety, and/or comfort of a considerable number of persons. Such action creates, contributes to, or maintains a public nuisance.

104.    Each Defendants' and/or their predecessors-in-interest's conduct is a substantial factor in bringing about the contamination of the Authority's wells.

105.    As a direct and proximate result of Defendants' and/or their predecessors-in-interest's acts and omissions as alleged herein, the Authority has incurred, is incurring, and will continue to incur injuries and damages related to the contamination of its wells with EHESC Contaminants in an amount to be proved at trial.

106.    As an owner of water production wells and purveyor of drinking water, the Authority suffers injuries different in kind from the community at large because it relies entirely upon its groundwater production wells for its public service functions; it is the sole entity responsible for achieving compliance with the UOC MCL as to water pumped from the Bridgehampton wells; and it is responsible for constructing, operating, and maintaining replacement wells and/or treatment facilities to address EHESC Contaminants in the Bridgehampton wells.

107.    Defendants are jointly and severally liable for all such damages, and the Authority is entitled to recover all such damages and other relief as set forth below.

108.    Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, knew it was substantially certain that their acts and omissions described above would cause injury and damage, including contamination of the Authority's wells with EHESC Contaminants. Defendants and/or their predecessors-in-interest, acting through their

20

directors, managers, and/or officers, committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Defendants and that fairly reflects the aggravating circumstances alleged herein.

**THIRD CAUSE OF ACTION**
**Trespass**
**(Against All Defendants)**

109.   The Authority realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

110.   The Authority owns and possesses its drinking water production system, including drinking water production wells that extract groundwater in its service area in Suffolk County, New York.

111.   The Authority actually and actively exercises its rights to appropriate and use groundwater drawn from the Long Island aquifer system into its wells and water system.

112.   The Authority did not give Defendants and/or their predecessors-in-interest permission to cause EHESC Contaminants to enter its groundwater wells or water system. Defendants and/or their predecessors-in-interest knew or reasonably should have known that the Authority would not consent to this trespass.

113.   Defendants and/or their predecessors-in-interest negligently and/or recklessly failed to properly use, control, and/or dispose of EHESC Contaminants, such that Defendants and/or their predecessors-in-interest proximately caused EHESC Contaminants to enter, invade, intrude upon, and injure Plaintiff's possession of property.

21

114.    Defendants and/or their predecessors-in-interest engaged in intentional, affirmative conduct that caused the trespass alleged herein, including by selling and/or manufacturing batteries containing the EHESC Contaminants; selecting a water-based fire suppression system for EHESC; using the water-based fire suppression system to extinguish the EHESC fire; designing EHESC without adequate fire suppression water containment capacity; failing to maintain adequate safety protocols and fire suppression systems designed to prevent, control and/or mitigate fires at EHESC; failing to design, implement, and/or maintain systems to prevent, mitigate, and/or remediate releases of EHESC Contaminants into the environment; and releasing fire suppression water containing EHESC Contaminants into the ground despite the fact that they knew or reasonably should have known that the fire suppression water would contain the EHESC Contaminants, that the EHESC site was in close proximity to drinking wells, and that the EHESC Contaminants have the propensity to infiltrate groundwater aquifers when released into the environment, are mobile and persistent groundwater contaminants capable of moving substantial distances within aquifers, are toxic to human health, and are therefore hazardous to drinking water systems and human health.

115.    Defendants' and/or their predecessors-in-interest's conduct constitutes a continuing unauthorized intrusion and a continuing trespass on the Authority's property.

116.    Each Defendants' and/or their predecessors-in-interest's conduct is a substantial factor in bringing about the invasion of the Authority's property, and specifically, the contamination of the Authority's wells.

117.    As a direct and proximate result of Defendants' and/or their predecessors-in-interest's acts and omissions as alleged herein, the Authority has incurred, is incurring, and will

continue to incur injuries and damages related to the contamination of its wells with EHESC Contaminants in an amount to be proved at trial.

118.    Defendants are jointly and severally liable for all such damages, and the Authority is entitled to recover all such damages and other relief as set forth below.

119.    Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, knew it was substantially certain that their acts and omissions described above would cause injury and damage, including contamination of the Authority's wells with EHESC Contaminants. Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Defendants and that fairly reflects the aggravating circumstances alleged herein.

**FOURTH CAUSE OF ACTION**
**Strict Product Liability for Defective Design**
**(Against Manufacturer Defendants)**

120.    The Authority realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

121.    Manufacturer Defendants and/or their predecessors-in-interest, as manufacturers, distributors, suppliers, sellers, and/or marketers of products containing hazardous materials, owed a strict duty to the Authority to market products that are not unreasonably dangerous for their intended use.

23

122.    Manufacturer Defendants and/or their predecessors-in-interest breached that duty by designing and selling defectively designed lithium-ion batteries which they knew or reasonably should have known were prone to catching fire, experiencing thermal runaway, and releasing harmful chemicals into the environment.

123.    The Authority was injured by the defective design of the lithium-ion batteries when the batteries caught fire, as they were prone to do, releasing harmful chemicals contained within those batteries into the surrounding environment.

124.    The lithium-ion batteries at EHESC were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

125.    Manufacturer Defendants' and/or their predecessors-in-interest's conduct is a substantial factor in bringing about the contamination of the Authority's wells.

126.    As a direct and proximate result of Manufacturer Defendants' and/or their predecessors-in-interest's acts and omissions as alleged herein, the Authority has incurred, is incurring, and will continue to incur injuries and damages related to the contamination of its wells with EHESC Contaminants in an amount to be proved at trial.

127.    Defendants are jointly and severally liable for all such damages, and the Authority is entitled to recover all such damages and other relief as set forth below.

128.    Manufacturer Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, knew it was substantially certain that their acts and omissions described above would cause injury and damage, including contamination of the Authority's wells with EHESC Contaminants. Manufacturer Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was

24

performed in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Manufacturer Defendants and that fairly reflects the aggravating circumstances alleged herein.

**FIFTH CAUSE OF ACTION**
**Strict Product Liability for Manufacturing Defect**
**(Against Manufacturer Defendants)**

129.    The Authority realleges each of the preceding paragraphs and incorporates each such paragraph as if fully stated herein.

130.    Manufacturer Defendants and/or their predecessors-in-interest, as manufacturers, distributors, suppliers, sellers, and/or marketers of products containing hazardous materials, owed a strict duty to the Authority to manufacture products without a defect that rendered those products unreasonably dangerous for their intended use.

131.    Manufacturer Defendants and/or their predecessors-in-interest breached that duty by defectively manufacturing lithium-ion batteries, which lead to the EHESC Fire.

132.    The Authority was injured by the defective manufacture of the lithium-ion batteries when, as a result of the manufacturing defect, the batteries caught fire, releasing harmful chemicals contained within those batteries into the surrounding environment.

133.    The Authority is informed and believes and thereon alleges that the lithium-ion batteries were used in a reasonably foreseeable manner and without substantial change in the condition of such products.

134.    Manufacturer Defendants' and/or their predecessors-in-interest's conduct is a substantial factor in bringing about the contamination of the Authority's wells.

25

135.    As a direct and proximate result of Manufacturer Defendants' and/or their predecessors-in-interest's acts and omissions as alleged herein, the Authority has incurred, is incurring, and will continue to incur injuries and damages related to the contamination of its wells with EHESC Contaminants in an amount to be proved at trial.

136.    Defendants are jointly and severally liable for all such damages, and the Authority is entitled to recover all such damages and other relief as set forth below.

137.    Manufacturer Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, knew it was substantially certain that their acts and omissions described above would cause injury and damage, including contamination of the Authority's wells with EHESC Contaminants. Manufacturer Defendants and/or their predecessors-in-interest, acting through their directors, managers, and/or officers, committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud, and/or malice. Such conduct was performed in conscious disregard to the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on public health and welfare. Therefore, Plaintiff requests an award of punitive damages in an amount sufficient to punish Manufacturer Defendants and that fairly reflects the aggravating circumstances alleged herein.

## VI.    PRAYER FOR RELIEF

Plaintiff Suffolk County Water Authority prays for judgment against Defendants, jointly and severally, awarding Plaintiff:

a.    Compensatory damages in an amount according to proof.

b.    Punitive damages in an amount to be determined at trial;

c.    Injunctive and equitable relief, including in the form of a fund to abate the nuisance and trespass;

d.    All appropriate declaratory relief;

26

e.   Plaintiff's costs in prosecuting this action, including reasonable attorneys' fees, court costs, expert fees, and other expenses of litigation;

f.   Pre-judgment and post-judgment interest; and

g.   All other relief this Court deems just, proper, and equitable.

## VII.   DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff requests a trial by jury of all claims asserted in this Complaint.

Dated: May 29, 2026                    Respectfully submitted,

*/s/ Matthew K. Edling*

MATTHEW K. EDLING
**SHER EDLING LLP**
266 Main Street
Farmingdale, NY 11735
Tel: (628) 231-2520
Email: matt@sheredling.com


TIMOTHY R. SLOANE (*pro hac vice forthcoming*)
THOMAS M. NEWMAN (*pro hac vice forthcoming*)
**SHER EDLING LLP**
100 Montgomery St. Suite 1410
San Francisco, CA 94104
Tel: (628) 231-2500
Email: tim@sheredling.com
         tnewman@sheredling.com


*Attorneys for Plaintiff Suffolk County*
*Water Authority*